David R. Ehrlich (de-9786)
Stagg Wabnik Law Group LLP
401 Franklin Avenue, Suite 300
Garden City, New York 11530
(516) 812-4550
dehrlich@staggwabnik.com

*Attorneys for Plaintiff*
*Anil Kumar Singla*


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X   Civil Action No.:   24-cv-4190

ANIL KUMAR SINGLA,

        Plaintiff,

        -against-                                                            **COMPLAINT**

SHERWOOD PARTNERS, INC.                                       **JURY TRIAL DEMANDED**

        Defendant.
-------------------------------------------------------------------------X

Plaintiff Anil Kumar Singla ("Plaintiff" or "Mr. Singla") by and through his attorneys Stagg Wabnik Law Group LLP, complaining of Defendant Sherwood Partners, Inc. ("Defendant" or "Sherwood"), herein alleges as follows:

## NATURE OF THE ACTION

1.     This is an action to remedy Defendant's unlawful retaliation and discharge of Mr. Singla in violation of the New York Whistleblower Law, New York Labor Law §740.

2.     During Mr. Singla's employment at Sherwood as a Managing Director, he helped manage and execute for Sherwood various types of engagements for distressed companies, the predominance of such engagements being assignments for the benefit of creditors ("ABCs").

3.     On June 20, 2022, Sherwood was engaged by a client named Pencil and Pixel, Inc. d/b/a Modsy ("P&P") which sought to enter into a "Pre-Packaged ABC" (defined below) as a

vehicle to effectuate the sale of its assets and wind down its residual operations given its financial and operating distress.

4.      Shortly following Sherwood's engagement with P&P, Mr. Singla was tasked with managing and facilitating the preparations for a contemplated Pre-Packaged ABC for P&P with Sherwood as the prospective assignee of the contemplated Pre-Packaged ABC. Among a variety of tasks and responsibilities, one of Mr. Singla's core responsibilities on the P&P engagement was to certify that the sales and marketing process and the proposed transaction for the sale of P&P's assets undertaken by the P&P management team was commercially reasonable under the Uniform Commercial Code ("UCC") and California law, *i.e.*, such certification being a requirement to enter into a Pre-Packaged ABC.

5.      For background and context, in Pre-Packaged ABCs, the buyer has been arranged by the underlying company assuming it conducted a commercially reasonable sales and marketing process prior to the ABC. In traditional ABCs, which are far more common than Pre-Packaged ABCs, the assignee of the ABC markets and sells the assets following the initiation of the ABC in parallel with its other duties, *e.g.*, the wind down of the residual operations of the company, and communications and distributions to the company's creditors and investors.

6.      In an ABC, the assignee takes on a role akin to that of a bankruptcy trustee or administrator. Sherwood, as the assignee of the Pre-Packaged ABC, had a fiduciary duty to the creditors of P&P to maximize the recoveries for the creditors and investors. A fiduciary relationship is one in which one party is bound in duty to another party or set of parties and held in trust to act with the utmost good faith for the best interests of the other party or parties.

7.      As to the P&P engagement, Plaintiff reviewed the P&P sales and marketing process, and documentation and communications between P&P and all prospective buyers

contacted by P&P over the several months prior to Sherwood's engagement with P&P, including those with (i) the ultimate buyer, Lennar Corporation ("Buyer" or "Lennar"), and (ii) the other prospective buyers which P&P had contacted or been in discussions with.

8.      Plaintiff refused to certify the sales process of P&P assets under the Pre-Packaged ABC for a bevy of reasons. There was a truncated sale and marketing effort with an extremely limited level of marketing of the assets by P&P and a limited number of prospective buyers involved overall in the sales process. The final sale price of $6.6 million was significantly deflated compared to the $25 million offer tendered a few weeks beforehand from Material Technologies Corporation d/b/a Material Bank ("MTC"). Plaintiff also saw clear and obvious conflicts of interest between P&P and Lennar.  Lennar was a large investor and Board member of P&P, and there appeared to be collusion between Lennar and MTC, prior to MTC withdrawing its $25 million offer and Lennar swooping in to purchase the P&P assets under the contemplated Pre-Packaged ABC for less than 25% of MTC's offer.  Plaintiff affirmatively asserted orally and in writing that he did not deem the P&P sales and marketing process to be commercially reasonable nor in compliance with the UCC and California law.

9.      Members of Sherwood applied significant pressure on Plaintiff throughout the review process to approve the deal regardless of its commercial unreasonableness and illegality. However, Plaintiff could not do so in good conscience because of the aforementioned factors, including but not limited to, conflicts of interest, potential collusion, lack of commercial reasonableness, and breach of fiduciary duty to the creditors of P&P.  Plaintiff's honest position about the commercial reasonability of the transaction stood as an obstacle in the way of Sherwood's desire to rubberstamp the deal.

10.    For further understanding, a distressed company unable to meet the conditions to effectuate a Pre-Packaged ABC could potentially enter into a traditional ABC pursuant to a general assignment agreement. In traditional ABCs the assignee markets and sells the assigned assets of the distressed company in a commercially reasonable manner following the initiation of the general assignment. During its engagement with P&P, Sherwood never considered a traditional ABC for P&P.

11.    Following Plaintiff's refusal to approve the sale as commercially reasonable and following other back and forth communications between Plaintiff and Defendant, Plaintiff was immediately removed from the P&P transaction and given paid time off ("PTO").    Shortly thereafter, on July 6, 2022, both the Prepackaged ABC between P&P and Sherwood, and the sale of the P&P assets to Lennar, were completed.

12.    Immediately upon Plaintiff's return to work, Sherwood discharged Plaintiff in retaliation for his raising of issues about the commercial unreasonableness of the sale process of P&P's assets and the illegality and commercial unreasonableness of selling P&P's assets to Lennar, and his refusal to approve the transaction between P&P and Lennar that smacked of collusion, corruption, fraud and conflict of interest—i.e., violations of California Civil Code, Uniform Commercial Code, and common law principles of fiduciary duty and fraud.

13.    Plaintiff brings this action against Sherwood to remedy its unlawful retaliation and retaliatory discharge in violation of NYLL § 740.

## JURISDICTION & VENUE

14.    This Court has jurisdiction over this action under 28 U.S.C. 1332(a), because there is diversity of citizenship and more than $75,000, exclusive of costs and interest, at stake in this litigation.

15.     Plaintiff Mr. Singla is a resident of the State of Florida.

16.     Defendant Sherwood is a corporation incorporated in the State of California, with its principal place of business also in California.

17.     Sherwood is therefore a citizen, resident, and domiciliary of a different state than that of Mr. Singla, who is a resident of Florida.

18.     Because complete diversity exists between Mr. Singla and Sherwood, this action is one of which the District Courts of the United States have original jurisdiction under 28 U.S.C. 1332.

19.     Venue is proper in this Southern District of New York pursuant to Title 28 U.S.C. § 1391(b) and (c) because Sherwood has an office in Manhattan, Plaintiff was based at this office in Manhattan during all relevant actions and events set forth in the Complaint, and that is where a substantial part of the acts giving rise to this action were committed, including the retaliation.

## PARTIES

20.     Plaintiff, Mr. Singla, is an individual currently residing in Florida. At all relevant times herein, Mr. Singla, as a Managing Director, lived in Connecticut and commuted to Sherwood's Manhattan office at 1350 Avenue of the Americas, 2nd Floor, New York, New York 10019; during all relevant times herein, Plaintiff was working in New York County in the State of New York. Plaintiff received a B.S. degree from Georgetown University, received an M.B.A. degree from University of Michigan, and has over twenty (20) years of corporate restructuring, investment banking, and management consulting experience.

21.     At all relevant times herein, Defendant, Sherwood, was and is a corporation doing business in the State of New York, with its principal place of business located at 3945 Freedom

Circle, Suite 560, Santa Clara, California 95054. Sherwood maintains an office in Manhattan at 1350 Avenue of the Americas, 2nd Floor, New York, New York 10019.

## STATEMENT OF FACTS

22.     Sherwood is a business which provides insolvency advisory and wind-down services to distressed companies. The company specializes in assignments for the benefit of creditors ("ABCs").

23.     ABCs are an alternative to federal bankruptcy filings and are filed at the state level pursuant to relevant state law. In federal bankruptcy actions, a judge and an independent bankruptcy trustee are appointed to ensure the creditors and investors are treated fairly in accordance with the law.   Alternatively, in an ABC, the underlying company, known as the "assignor", directly selects the assignee pursuant to Board and shareholder approvals.  In a typical ABC, the sale and marketing of the assets, along with other duties, are performed by the assignee *after* the initiation of the ABC. However, if the assignor prior to selection of the assignee had already completed a commercially reasonable sale process and found a buyer to acquire the assets, and the assignee, after performing its due diligence, believes such transaction is in the best interests of the creditors of the ABC estate, then the ABC may be structured as a "Pre-Packaged ABC," wherein the initiation of the ABC and consummation of the sale all happen at once, *i.e.*, on the same day.

24.     In a California ABC, there is no judge or bankruptcy trustee appointed to ensure the creditors and investors are treated fairly.  In the case of P&P, the ABC was filed in California where the primary governing law is found in California Code of Civil Procedure sections 493.010 to 493.060 and section 1800 to 1802. The overarching idea is that companies such as Sherwood

facilitate ABCs to ensure the creditors are not fleeced and that any such transactions are conducted fairly, commercially reasonable, and free of corruption, fraud or other wrongdoing.

25.     A Pre-Packaged ABC is predicated on the assignee's review of the assignor's pre-ABC sales and marketing process, and certification that such sales and marketing process was conducted by the company in a commercially reasonable manner, *i.e.*, that the assets of the assignor were properly marketed and valued, and that the transaction is fair and in the best interests of the creditors of the ABC estate.

26.     Sherwood hired Plaintiff in 2014 as a Vice President and successively promoted him over the ensuing years to the role of Managing Director. In his most recent annual performance evaluation prior to Sherwood's P&P engagement, Plaintiff received a very positive review and feedback about his performance. At the time of his unlawful discharge, Plaintiff had an annual base salary of $345,000.

27.     On June 20, 2022, Sherwood was engaged by P&P to consummate the sale of P&P assets to Lennar via a Pre-Packaged ABC.

28.     "P&P", which was based in San Francisco, had developed a technology and business offering to help homeowners, remodelers, and renters virtually create through smartphones and other technologies personalized interior designs of their respective dwellings and to procure home furnishings based on such designs through an integrated online technology platform. In 2022, financial and operating issues emerged, and P&P was unable to fully deliver products to its customers and meet its creditor payment requirements.  Orders were ultimately cancelled, certain employees were terminated, a groundswell of complaints from consumers formed and a host of other problems arose. Given the volume and nature of the problem, complaints swelled from grassroots consumers each with thousands of dollars owed to them. Upon

information and belief, the California Attorney General's office received complaints and calls, and had authority to commence an action against P&P.

29.    Seeing that the company was falling apart, as it had limited cash to work with and was in debt to many customers and other creditors, P&P and its legal counsel explored insolvency proceeding options. P&P sought to avoid a Chapter 7 or Chapter 11 federal bankruptcy and preferred the non-judicial California ABC process.

30.    Plaintiff, as a prior employee of Defendant, was brought in to manage and facilitate the Pre-Packaged ABC process and preparations. Plaintiff was supervised on the P&P engagement by Bernie Murphy ("Murphy"). Murphy is a Senior Managing Director at Sherwood who was overseeing the day-to-day tasks for the engagement.

31.    Plaintiff's job on the P&P engagement, among other duties, was to certify that the pre-ABC sales and marketing process of P&P's assets conducted by P&P's management team was commercially reasonable in accordance with the UCC and California law. For further clarification, this was a scenario in which P&P had not yet assigned its assets to Sherwood as the contemplated assignee. Rather, Sherwood was tasked to review the sales and marketing process as prospective assignee of the Pre-Packaged ABC and certify its commercial reasonableness. This certification was a prerequisite for Sherwood and P&P to enter into the contemplated Pre-Packaged ABC and sale to Lennar.

32.    Structured as a "Pre-Packaged" ABC, P&P had already found a buyer and the volume of transactional due diligence had already been completed by such buyer. The proposed sale was contemplated to be completed immediately following the initiation of the Pre-Packaged ABC. With a Pre-Packaged ABC, Sherwood was required to ensure that the transaction and the

sales and marketing process conducted by P&P as prospective assignor was commercially reasonable and in compliance with the UCC and California law.

33.     The ultimate buyer of the P&P assets in this Pre-Packaged ABC was Lennar. Lennar is one of the largest homebuilders in the United States with annual revenue of $34 billion in fiscal year 2023.  By purchasing the P&P intellectual property and integrating it into its other offerings, Lennar aimed to make the home design and furnishing process easier and more efficient. The P&P intellectual property would allow homes to be designed and furnished with interior structures much earlier in the home buying or selling process – a capability unprecedented in the homebuilding industry.

34.     Preparing for the contemplated Pre-Packaged ABC and simultaneous sale was a significant undertaking for Sherwood in the case of P&P particularly given the time constraints, the enormity of the transactional due diligence required, and issues related to the transition of the assets from P&P to the new buyer. Unlike other projects Plaintiff had worked on for Sherwood over his eight (8) year career there, in the case of the P&P engagement, Sherwood did not provide additional staffing to assist Plaintiff.  Plaintiff raised the lack of resources formally in writing to Sherwood, but Sherwood's management told Plaintiff that they would not be providing additional resources to assist him.  The rejection of Plaintiff's request for assistance struck Plaintiff as odd, as Sherwood had typically and automatically provided him supporting resources when working on a project with similar complexities, and particularly in recent years given his role as Managing Director. There was so much work to be done and in a highly compressed period of time that Plaintiff that at one point worked forty-five (45) hours straight from June 28, 2022, to June 30, 2022, with virtually no break or sleep.

35.     Despite the lack of assistance provided by Sherwood, Plaintiff initiated his various tasks for the P&P engagement which included a formal review and assessment of P&P's legacy sales and marketing process, going through a digital library of emails and files, interviewing P&P management with respect to the sales process, and more.

36.     Following his initial dive into the files and communications, Plaintiff immediately noticed that over the several months prior to the Sherwood engagement, P&P had only outreached to a grand total of five (5) prospective parties of interest. This appeared to Plaintiff as a strikingly low number of prospective bidders for a technology and intellectual property of similar nature and value to P&P's assets. Plaintiff also noted that prior to Sherwood's engagement with P&P, no investment banking or other advisory firm was ever engaged by P&P to help market such assets for sale. Often such lack of sales and marketing efforts alone may be immediate cause to disapprove a transaction as lacking commercial reasonableness.

37.     Following Plaintiff's deeper dive into the files, Plaintiff's suspicions about P&P's sale to Lennar began to take further shape. On or about June 21, 2022, Lennar submitted its offer to acquire the P&P assets through a letter of intent signed by a Lennar affiliated entity called LenX SPC Investments, LLC (the "Lennar LOI"). To effectuate the sale, a special purpose entity called End to End, Inc. ("Lennar-End-to-End") was formed by Lennar to house the acquired P&P assets.

38.     As Plaintiff became familiar with the circumstances surrounding the proposed sale to Lennar, he began seeing troubling signs concerning the transaction between Lennar and P&P and conflicts of interest.

39.     Plaintiff discovered that some of the entities that had an interest in Lennar-End-to-End were entities that also had interests and other roles in P&P prior to the sale. In other words, Lennar was on both sides of the deal.

40.    Lennar was also a prior investor in P&P – in fact, prior to the sale, Lennar was the third largest shareholder of P&P, holding an 11.0 percent fully-diluted equity interest in P&P—an example of Lennar being on both sides of the deal. Lennar provided $3.0 million in funding to Lennar-End-to-End, the special purpose entity established to house the assets following the sale.

41.    Technology Crossover Ventures d/b/a TCV ("TCV"), a venture capital firm, also had an interest in both P&P and Lennar-End-to-End. As of June 30, 2022, TCV was P&P's largest shareholder, holding a 19% interest in P&P on a fully diluted basis, across the multiple TCV funds invested in P&P. In a formal insolvency proceeding, pursuant to federal and state law, similarly situated creditors and equity holders must be treated equally. Here, TCV, a shareholder of P&P, was benefitting from the Lennar sale transaction differently than other similarly situated equity holders of P&P.

42.    Norwest Venture Partners ("Norwest") was another venture capital firm which had an interest in both P&P and Lennar-End-to-End. Prior to the sale, Norwest was one of P&P's largest stockholders, with a 15% fully diluted equity interest. Norwest was also benefitting from the Lennar sale transaction differently than other similarly situated equity holders of P&P.

43.    Lennar, TCV, and Norwest benefitted differently from other similarly situated equity holders of P&P because, as equity holders in Lennar-End-to-End, they were getting the P&P technology at a bargain price while the creditors and other investors of P&P were hurt by the depressed sale price and received no other benefit like those who also had equity in Lennar-End-to-End.

44.    However, it was not just the fact that Lennar affiliated investors in P&P were set to invest in the purchase of P&P's assets at an artificially low price that bothered Plaintiff. Certain

members of P&P's Board of Directors prior to the sale were from Lennar and the aforementioned venture capital investors in Lennar-End-to-End.

45.     As he continued to work tirelessly on the deal, Plaintiff found that members of Norwest, TCV, and Lennar all had roles on the Board of Directors of P&P. The Senior Managing Partner of Norwest and a Venture Partner at TCV were both members of the P&P Board of Directors.

46.     Furthermore, Board of Directors observation privileges were granted by P&P to Lennar's Managing General Partner as well who thereby, as an observer of the P&P board meetings, had access to inside information and board discussions.

47.     After diving through the files and interviewing members of the board, Plaintiff was surprised to learn that on or about May 27, 2022, P&P had received a term sheet from MTC to acquire the outstanding equity and assume the debts of P&P for $25 million (the "MTC Term Sheet").   MTC is a provider of architectural, construction and design samples of fabrics and other materials to architects, designers, and other professionals in the homebuilding and home furnishing industries. The MTC deal was a way for P&P to get out of debt and find a proper buyer for its products and services, as P&P had been struggling with increasing public noise and internal pressure from its creditors.

48.     On June 15, 2022, however, following rounds of due diligence by MTC and meetings between members of MTC and P&P, MTC abruptly backed out of the deal, citing merely that it lacked approval from MTC's Board of Directors.  With the abrupt departure of MTC from the deal, P&P had to rapidly find another buyer or consider a formal insolvency proceeding.

49.     Just one week later, on June 22, 2022, Lennar submitted its letter of intent to acquire the assets of P&P.  The Lennar LOI was predicated on P&P entering into a Pre-Packaged ABC, in

which the P&P assets would be first transferred to an assignee selected by P&P, then immediately sold by the assignee to Lennar as the buyer (with the assets placed in Lennar-End-to-End).

50.     The ultimate asset purchase agreement submitted by Lennar (the "Lennar APA") reflected a purchase price of approximately $6.6 million (over $18 million less than the MTC offer). Of this $6.6 million purchase price, $5.1 million would be used to pay off P&P's main secured creditor, Silicon Valley Bank, a commercial bank based in California.

51.     Plaintiff was concerned that the nearly $20 million decrease in the sales price would cause harm to creditors, which it ultimately did, and violate Sherwood's fiduciary duty to the creditors of the P&P estate. (One of the many creditors furious with the depressed sale price lost $14 million as the eventual deal with Lennar did not provide enough capital to cover their secured credits against P&P).

52.     As part of Sherwood's review of the legacy sales process, in late June-early July, Sherwood's counsel to the P&P engagement, Robert Eisenbach of Cooley LLP ("Eisenbach"), conducted interviews with members of the P&P board. Plaintiff was asked by Sherwood to participate in these interviews which centered around the sales process and details about how the proposed transaction came to be. Following these interviews, Plaintiff raised his specific concerns to Eisenbach regarding the deal, the various conflicts of interest and evidence of illegality.

53.     Later that day, Plaintiff received a call from Murphy who wanted to know what Plaintiff's thoughts were on the transaction.  Plaintiff expressed to Murphy his issues with the transaction, specifically mentioning how the sudden exit of MTC prior to Lennar emerging and the appearance of collusion between MTC and Lennar were giving him trouble in approving the deal.  In response, Murphy began screaming, saying he had no idea what Plaintiff was talking about, that Plaintiff was making no sense and that Plaintiff needed to do his job.

54.     As part of their work on the P&P engagement, Murphy often provided assignments to Plaintiff. One of these assignments was for Plaintiff to review a flow of funds document regarding the prospective funding of the Lennar-End-to-End transaction and payments to certain secured creditors of P&P, and to see if there were any issues.

55.     Despite obvious mistakes and problems in the flow of funds document, Murphy made no mention of these issues to Plaintiff.  When Plaintiff voiced his concerns regarding the mistakes and overall problems with the flow of funds document—the document showed obvious conflict of interest described above--Murphy once again began to scream at Plaintiff.  This time, Murphy made his agenda very clear as he told Plaintiff to "just get it done." Based on this and prior interactions with Murphy, Plaintiff knew that Murphy simply wanted Plaintiff to approve the deal despite potential illegalities.

56.     Plaintiff, seeing the abrupt and odd departure of MTC from the acquisition picture, the quick turnaround of the Lennar offer, the significantly deflated sales price, conflicts of interest, and the damages this deal would cause P&P creditors, viewed the sale of the P&P assets to Lennar-End-to-End as illegal.   Moreover, he found it odd that after months of negotiating with MTC for a much higher purchase price, P&P was now accepting an offer from an insider for a significantly lower price and without any further outreach to other potential buyers. Plaintiff was also surprised Lennar was moving forward with the deal without extensive due diligence.  Nevertheless, Plaintiff was aware of the time sensitivity given the reduction in liquidity.  Plaintiff deemed that the P&P engagement would be better suited to have been structured as a traditional ABC (versus a "pre-packaged" ABC) or be handled through a more suitable insolvency proceeding such as a Chapter 7 or Chapter 11 federal bankruptcy.

57.     As P&P's financial distress became more known within the industry, additional potential interested parties expressed interest in acquiring P&P's assets, such interest often communicated to P&P in the form of emails that were forwarded to Sherwood. However, there was no effort on the part of P&P's management team, nor any such efforts facilitated by Sherwood, to reach out to these new potential buyers and solicit further interest.

58.     As a result of all of these facts and circumstances, Plaintiff was deeply distressed about the legality of the sale to Lennar. As such, Plaintiff sought to seek opinions from executives and counsel on the sale.

59.     On July 3, 2022, Plaintiff sent a formal letter to Michael A. Maidy ("Maidy"), Co-Founder and Co-CEO of Sherwood, transmitted both by express mail and email, specifically recommending to him that counsel for Sherwood should provide a formal a risk assessment to Sherwood concerning the prospective P&P Pre-Packaged ABC. Maidy never responded or reached out to Plaintiff with respect to this letter.

60.     The following day, on July 4, 2022, Plaintiff sent another formal letter to Maidy, transmitted both by express mail and email, stating the following: "*I deem the sale and marketing process conducted by [P&P, Inc.] (the "Company") to not be commercially reasonable pursuant to the relevant California code as it pertains to the review process I was asked to perform per our engagement with the Company pursuant to the Engagement Letter dated June 20, 2022.*" Maidy never responded or reached out to Plaintiff with respect to this letter either.

61.     Also, on July 4, 2022, Plaintiff sent an email to Murphy, copying Maidy and Eisenbach, stating the following: "*I've reviewed the sales process for [P&P, Inc.] as instructed, pursuant to the engagement between [Sherwood] and [P&P] as prospective Assignor. I do not deem it to be commercially reasonable based on three (3) factor tests.: (1) The proceeds test for*

*products with an ascertainable market, i.e. how much the assets were sold for, (2) The totality of the circumstances test… in the type of property that was the subject of the disposition, (3) The procedures test… did potential buyer(s) have an opportunity to participate?"*

62.     Plaintiff, in good conscience, could not approve the sales and marketing process of P&P as commercially reasonable due to the points of evidence he had observed of corruption, conflict of interest, Sherwood's breach of fiduciary duty to the P&P creditors, and the inept sales and marketing process. In addition, it struck Plaintiff as odd that Lennar had never signed a non-disclosure agreement ("NDA") with P&P nor conducted much due diligence on P&P or its assets prior to tendering its offer on June 21, 2022 which for most buyers of this type of technology or intellectual property similar in nature, value and complexity to P&P's assets would typically require them several weeks or months of due diligence.

63.     In addition to Maidy, the July 3 and 4 letters were also forwarded to Eisenbach, as counsel for Sherwood. Plaintiff did not send these letters to Murphy, as Plaintiff figured any further discussions or involvement with Murphy regarding Plaintiff's concerns with the deal would simply cause Murphy to scream at him more and attempt to further pressure him into approving the transaction.

64.     Prior to the aforementioned letters being sent to Maidy, Plaintiff had already expressed to Sherwood's management orally and otherwise in writing by email that he deemed the contemplated P&P transaction with Lennar to be problematic, that the transaction and sales and marketing process was not commercially reasonable, and that he perceived evidence of corruption and conflicts of interest.  Sherwood's management did not appear to care about the findings or opinions of Plaintiff and instead appeared to want the transaction to be approved regardless of the perceived illegalities and other issues of concern presented by them.

65.     Sherwood management expressly discouraged Plaintiff from reaching out to any of his fellow co-workers at Sherwood for any questions or guidance. As an example, in early July 2022, to help evaluate the P&P transaction, Plaintiff reached out to co-worker at Sherwood, Ms. Molly Froschauer ("Froschauer"), to ask her about the determining criteria for commercial reasonableness for a transaction in an ABC, given her knowledge of that topic. Within days thereafter, after learning of Plaintiff's communications with Froschauer, Maidy called Plaintiff and vehemently snapped at him telling Plaintiff he was expressly not allowed to speak to Froschauer or anyone else at Sherwood about the P&P matter except himself or Murphy.

66.     After working tirelessly on the P&P engagement and following his transmittal of the opinion that the deal should not go through, Plaintiff was given paid time off ("PTO") by Sherwood.

67.     With Plaintiff on PTO, the deal between Lennar and P&P closed on July 6, 2022, despite Plaintiff's lack of certification of the sales process or the transaction.

68.     On or about July 8, 2022, while Plaintiff still on PTO, Maidy called Plaintiff and personally informed him that he was formally being taken off the P&P matter.

69.     Plaintiff was taken aback that the concerns he raised about the transaction between P&P and Lennar were not being taken seriously, or that Sherwood never responded to the issues he had raised regarding the sales process. Instead, he was simply taken off the project altogether in a manner not typical to any other prior experience he had had on any other engagement at Sherwood during his eight (8) years of tenure at the firm.

70.     On or about July 11, 2022, Plaintiff filed a formal complaint with Sherwood's third-party human resources group, TriNet Group, Inc. ("TriNet"), pursuant to the processes and procedures stated in Sherwood's employee handbook.  TriNet handles payroll, human resources,

and other compliance-related matters for Sherwood. Plaintiff's complaint to TriNet was tendered initially orally but was followed up in written fashion via an email, as instructed by TriNet. The complaint centered around a bevy of issues but included complaints about bullying tactics from Murphy pressuring him to approve and support the P&P and Lennar deal, the overall inappropriate decision to enter into the Pre-Packaged ABC, and the employment related issues associated with the P&P engagement. Over the course of his full eight (8) year tenure at Sherwood, Plaintiff had never previously filed a complaint to TriNet against Sherwood for any reason.

71.    During the two weeks following Plaintiff's formal complaint to TriNet, Plaintiff received no response or inquiry from Sherwood about such complaint. Then, on or about July 25, 2022, Sherwood's human resources and compliance representative, Chheko Taing ("Taing" or "Sherwood HR Rep") called Plaintiff to discuss the complaint he had made to TriNet. The call ended with Taing stating he would speak to others and get back to Plaintiff by the end of the week.

72.    Then, on July 28, 2022, Maidy called Plaintiff and told him he was being discharged, that his final day of employment at Sherwood would be the following day, July 29, 2022, and that all of his and his dependents' benefits, including health and other benefits, would be ending July 31, 2022. When Plaintiff asked for the reason for his abrupt and sudden termination, Maidy told him it was due to a "lack of judgment", poor decision making on the P&P project, and because of Plaintiff's complaint to TriNet.

73.    On July 29, 2022, Plaintiff had further conversations with Taing who told Plaintiff that (i) on July 25, 2022, before any evaluation of Plaintiff's complaint to TriNet was conducted by Sherwood, that Taing was instructed to work directly with TriNet to initiate the preparation of a termination release letter and other termination related processes, and that (ii) Sherwood's

eventual discovery phone call with Plaintiff regarding his TriNet complaint was merely suggested by TriNet to Taing once TriNet was made aware of the impending termination of Plaintiff.

74.     Sherwood discharged Plaintiff because he refused to violate the law and approve the P&P transaction with Lennar.  Because Plaintiff refused to ignore the illegalities of the P&P transaction with Lennar, *i.e.*, the commercially unreasonable process of the transaction, and the corruption and conflict of interest clearly present in the transaction, Sherwood retaliated against him by discharging him.  This was a transaction that Plaintiff, in good faith and with good reason, believed was detrimental to the P&P creditors (and correspondingly a windfall for Lennar), and violated the California laws (something he had clearly expressed in writing to Sherwood though received no response).   Plaintiff further believed that Sherwood's approval of the transaction would be considered a breach of its fiduciary duty to the creditors.  Sherwood discharged him in retaliation for not going along with acts that Plaintiff, in good faith, believed violated the law.  Meanwhile, Plaintiff had been a loyal full-time employee of Sherwood for over eight (8) years.

75.     Lennar desperately sought the P&P technology intellectual property and wanted it at a bargain price, with less risk or liability, and with ease of acquisition regardless of how it impacted the P&P creditors.  Sherwood was charged with reviewing the transaction to ensure it was commercially reasonable and legal, and that the P&P creditors were being treated fairly.  When Plaintiff, in good faith, raised the illegalities of the deal and that it was not in compliance with California law, Plaintiff was taken off the project and discharged.

76.     Sherwood's action of discharging Plaintiff for raising the illegalities of the P&P transaction with Lennar, and not going along with what Plaintiff believed, in good faith, was an illegal transaction is a violation of New York Labor Law section 740.

## AS AND FOR A FIRST CAUSE OF ACTION
## AGAINST SHERWOOD
## (VIOLATION OF NEW YORK LABOR LAW § 740)

77.     Plaintiff hereby repeats, realleges, and reiterates all of the allegations stated above as if fully set forth herein.

78.     NYLL § 740 (2) provides that: "*An employer shall not take any retaliatory action against an employee, whether or not within the scope of the employee's job duties, because such employee does any of the following…. discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation…*"

79.     Plaintiff was an employee of Sherwood for over eight (8) years and reported to Maidy, one of the partners of Sherwood, and also reported to certain other directors of Sherwood.

80.     Plaintiff, on three separate occasions, as described *supra*, engaged in protected activity when he complained to Sherwood twice via formal letters and to TriNet about what he reasonably believed to be the illegal and commercially unreasonable P&P transaction with Lennar, a transaction he believed violated the UCC and California law.

81.     The P&P transaction with Lennar, which Sherwood was hired to review to ensure it was commercially reasonable, reasonably appeared to Plaintiff to be a violation of California Civil Code §3439.04, which provides that a transfer made is voidable as to a creditor where the debtor made the transfer with:  (1) actual intent to hinder, delay or defraud any creditor of the debtor, (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor either (A) Was engaged or was about to engage in a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction

or (B) intended to incur, or believed or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they became due.

82.     Subsection (b) of §3439.04 lists factors to be considered in determining actual intent for purposes of violation of the statute. Numerous factors present in subsection (b) are applicable to the P&P sale: (1) the transfer was made to insiders (Lennar, TCV, Norwest), (2) the transfer was of substantially all the P&P's assets, (3) the value of the consideration received by P&P was not reasonably equivalent to the value of the asset transferred, and (4) P&P was insolvent or became insolvent shortly after the transfer was made.

83.     Plaintiff also reasonably believed that the P&P transaction with Lennar violated California Civil Code §3439.05. Under §3934.05 a transfer made by a debtor is voidable as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time.

84.     Here, P&P was on the pathway to bankruptcy and the consideration received from Lennar of $6.6 million was not a reasonable value.  The unreasonably low consideration received is further evidence by the fact that a few weeks prior there had been an offer on the table for $25 million from MTC.

85.     Plaintiff reasonably believed that the transaction between P&P and Lennar was not commercially reasonable based on the marketing and sales process in violation of the UCC.

86.     Furthermore, Plaintiff reasonably believed that Sherwood's quick and rushed approval of the transaction, and inappropriateness of a Pre-Packaged ABC when the requisite requirements of effectuating one were lacking, were indicative of a clear and obvious breach of Sherwood's fiduciary duty to the creditors of P&P. Sherwood, as assignee, should have taken

Plaintiff's concerns more seriously and further assessed how such a deal would impact the creditors to whom they owed a duty.

87.     Sherwood retaliated against Plaintiff by discharging him because Plaintiff would not approve the illegal transaction and expressly stated, both orally and in writing, that the transaction was illegal, commercially unreasonable and in breach of Sherwood's fiduciary duty to P&P's creditors.

88.     Plaintiff reasonably believed that there was a violation of law with regard to the P&P transaction with Lennar -- he expressly asked Maidy to have counsel for Sherwood provide a risk assessment for the transaction and expressly communicated his refusal to Maidy and Murphy to deem it commercially reasonable pursuant to California law.

89.     In retaliation for Plaintiff refusing to rubberstamp and approve the illegal transaction, Plaintiff was taken off the project and discharged for what was called "poor judgment".

90.     By engaging the foregoing conduct, Sherwood's conduct directly violated NYLL §740.

91.     As a direct and proximate result of Sherwood's action in violation of NYLL § 740, Plaintiff was damaged and is entitled to damages for back pay, front pay, emotional distress, punitive damages, lost benefits, and attorney's fees. As of the date of this filing, Plaintiff's back pay damages is not less than $632,500 which, separate and apart from other damages sought herein, well exceeds the $75,000 threshold amount of damages in controversy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendant:

A.  Awarding Plaintiff damages in an amount to be determined at trial plus interest to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, back pay, front pay, lost compensation, compensation for his severe mental anguish and emotional distress, stress and anxiety, loss of self-esteem, self-

confidence and personal dignity, emotional pain and suffering and other physical and mental injuries;

B.  Awarding Plaintiff punitive damages in an amount to be determined at trial; and,

C.  Awarding Plaintiff costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorney's fees to the fullest extent permitted by law.

Dated:  Garden City, New York
       May 31, 2024

                              Stagg Wabnik Law Group LLP


                              By: /s/_____
                                   David R. Ehrlich
                              *Attorneys for Plaintiff*
                              *Anil Kumar Singla*
                              401 Franklin Avenue, Suite 300
                              Garden City, New York 11530
                              (516) 812-4550